UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN THE MATTER OF:           )
                            )
THE QUAY CORPORATION, INC., )   CASE NO. 05 B 63146
                            )
    Debtor                  )

MEMORANDUM OPINION
1. On Objection of Wisconsin Cheese Group ("Wisconsin Cheese")
   to Confirmation of Second Amended Plan ("Plan Objection")
2. On Objection of Wisconsin Cheese to Debtor's Motion
   to Approve Settlement Agreement ("Settlement Objection")

The issues discussed here relate to this pending Chapter 11 case filed by the Debtor, The Quay Corporation, Inc. ("Quay"). Quay engaged in a long period of litigation with Mexican Cheese Producers, Inc. ("MCP") both before and since this bankruptcy case was filed. The extensive history of that expansive litigation and ultimate proposal to settle are described in the Motions ("Introduction" at ¶¶1 through 24), and that history is incorporated in this Opinion by this reference. Those parties have now settled and move for approval of the Settlement.

The detailed settlement terms are described and incorporated into the proposed Second Amended Disclosure Statement and Second Amended Plan of Reorganization, and are referred to in the Motion ("the Settlement" at ¶ 25 and subparagraphs). The Wisconsin Cheese Group, a creditor ("Wisconsin Cheese") has objected both to the Plan and to the Settlement.

Although only two of the Settlement terms have been objected to by Wisconsin Cheese in its Plan Objection and Settlement Objection, a summary of the Settlement and Plan terms is useful to set the context for consideration of the Wisconsin Cheese arguments:

A. MCP shall have an allowed claim [not subject to any avoidance actions, defenses or reconsideration except as expressly provided in the Settlement Agreement and related documents] in the amount of $2,300,000.00 ("MCP Claim"). The MCP Claim is classified in Plan Class 2 separately from other unsecured creditors ("Other Unsecured Creditors') who are placed in Class 3 under the Second Amended Plan;

B. The MCP Claim shall be secured by liens and security interests on all of the Debtor's assets, which liens and security interests shall be subordinate to the pre-existing liens and security interests of Cole Taylor Bank;

C. In the event the Debtor pays MCP the total principal amount of $2,275,000.00 plus accrued interest on or before the 545th calendar day after the Effective Date of the Second Amended Plan, MCP shall be deemed to have accepted said amount as payment in full of The MCP Claim;

D. On the Effective Date of the Second Amended Plan, the Debtor shall remit to MCP and Other Unsecured Creditors as against their allowed claims their pro-rata share of $1,500,000.00 ("Initial Payments'), such Initial Payments to be funded by a loan made by Hector from the Quay principals to the Debtor;

E. The remaining principal balance of the MCP Claim and the allowed claims of Other Unsecured Creditors shall be paid in full with interest (at the prime rate of interest published by LaSalle Bank) amortized over a five (5) year period with lump sum balloon payments of the accelerated principal balances then due and owing on the third anniversary date of the Effective Date of the Second Amended Plan;

F.  Quay principals Hector and Victor will personally guaranty all amounts due and owing to MCP and Other Unsecured Creditors;

G.  For purposes of the Settlement only and only in conjunction with confirmation of the Second Amended Plan, the definition of "insiders" shall be expanded to include Hector, Victor, Katalina Enterprises, LLC and Catalina Properties, LLC ("Insiders");

H.  For purposes of the Settlement only and only in conjunction with confirmation of the Second Amended Plan, Insiders shall agree to the voluntary subordination of all of their pre-petition claims to the allowed claims of Cole Taylor Bank, MCP and Other Unsecured Creditors;

I.  The voluntary subordination of the pre-petition claims of Insiders shall not preclude the Debtor from making payments to its shareholders for income tax liability arising from their shareholder interests in the Debtor, to Catalina Properties, LLC and Katalina Enterprises, LLC for obligations arising after the Effective Date of the Second Amended Plan under pre-petition contracts with the Debtor, and to Hector for loans he makes to the Debtor pursuant to the Second Amended Plan.[1]

J.  In the event that the Debtor defaults in its obligations to MCP under the Second Amended Plan, the Settlement Agreement or the related documents, and in the

---

[1] Under the Second Amended Plan and the Settlement Agreement, any loans made by Hector after the Effective Date shall be secured by liens and security interests in all assets of the Debtor, such liens and security interests being subordinate to the liens and security interests of Cole Taylor Bank and MCP. Furthermore, any such loans from Hector shall be repaid by the Debtor on terms identical to those for payment of the allowed claims of MCP and Other Unsecured Creditors.

event the Debtor fails to cure such defaults, MCP shall be entitled to foreclose on its liens and security interests;

K. In the event that MCP forecloses on its liens and security interests and MCP acquires the Debtor's assets through such foreclosure, MCP shall pay the unpaid balances due to Other Unsecured Creditors as against their allowed claims.

L. In the event that MCP forecloses on its liens and security interests and MCP is not the successful bidder at the foreclosure sale of the Debtor's assets, MCP shall share the proceeds of the foreclosure sale with Other Unsecured Creditors, less foreclosure costs;

M. The Plan Committee shall have standing to appear and be heard in any court of competent jurisdiction to enforce rights of the Committee and Unsecured Creditors to payment from MCP in the event of foreclosure by MCP;

N. So long as the MCP Claim remains unpaid, MCP shall have a right of first refusal to purchase the Debtor's assets in the event the Debtor negotiates a sale of any or all of its assets outside the ordinary course of its business;

O. Subject only to the express provisions of the Settlement Agreement, in the event all or substantially all of the stock in the Debtor is sold, or in the event that the Debtor issues new stock such that Hector and Victor do not hold at least 51% of the outstanding stock of the Debtor, the obligations of the Debtor to MCP and Other Unsecured Creditors shall become immediately due and payable;

P. All litigation pending in any court between the Debtor, MCP and related parties shall be dismissed with prejudice; and

Q.  The Debtor and its affiliates and MCP and its affiliates shall exchange general releases.

**Basis for Approval of the Settlement**

The Amended Plan now awaiting a final confirmation hearing was approved by votes of all creditors except for Wisconsin Cheese. Wisconsin Cheese does not attack the Plan and Settlement except for two issues discussed below. If those issues are found to have no merit, it is clear that the Settlement warrants approval for reasons discussed here.

Bankruptcy Rule 9019 provides, in relevant part, "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."
Fed. R. Bankr. P. 9019(a). Compromises are tools for expediting the administration of the case and reducing administrative costs and are favored in bankruptcy. See Fogel v. Zell, 221 F.3d 955, 960 (7th Cir. 2000).

Approval of a proposed settlement is within the discretion of the Court. In re Del Grosso, 106 B.R. 165, 167 (Bankr. N.D. Ill. 1989). A settlement should be approved by a bankruptcy court if the settlement is in the best interest of the estate. In re Griffin Trading Co., 270 B.R. 883, 903 (Bankr. N.D. Ill. 2001) (citing In re American Reserve Corp., 841 F.2d 159, 161 (7th Cir. 1987)). In determining whether a settlement is in the best interest of the estate, courts compare the settlement's terms with the litigation's probable costs and benefits, and examine the litigation's probability of success, the litigation's complexity, and the litigation's attendant expense, inconvenience and delay. In re Telesphere Communications, Inc., 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994) (citing In re Energy Co-op,

Inc., 886 F.2d 921 (7th Cir. 1989) and American Reserve, 841 F.2d 159; Energy Co-op., 886 at 927; See also In re Miller, 148 B.R. 510, 516 (Bankr. N.D. Ill. 1992).

The litigation costs to all parties relating to issues and matters pending in this Court, the Illinois Circuit Court, and the appeals certain to follow from the Orders and Judgments relating to these matters have been, and would continue to be, considerable. Those issues are extremely complex with high risks attendant to the likelihood of success for any of the parties to these various pieces of litigation. Importantly, it might not be possible to conclude this Chapter 11 case and confirm any Plan of Reorganization before all of the litigation among the various parties and related appeals is completed. Finally, since the Debtor no longer will have an exclusive right to solicit acceptances to any Plan of Reorganization, MCP and others have expressed their desire to file competing Plans of Reorganization/Liquidation thereby further complicating and extending the expensive confirmation process under Section 1129 of the Bankruptcy Code.[2]

Approval of the proposed settlement in conjunction with confirmation of the Second Amended Plan will completely avoid all of these large costs, eliminate any further delays to the Debtor's Chapter 11 exit strategy, culminate with a global resolution of all litigation among all parties in all forums and result in the payment of all allowed claims of unsecured as well as secured creditors in full with interest. Under these circumstances, the proposed Settlement gives a positive result to all creditors and does so without awaiting long years of litigation.

---

[2] Under § 1121(d)(2)(B) of the Bankruptcy Code, the Debtor's exclusive period to solicit acceptances to its Plan of Reorganization will automatically terminate by the hearing on confirmation of the Second Amended Plan.

- 6 -

Before reaching the objections of Wisconsin Cheese, it must therefore be concluded that approval of the proposed Settlement is in the best interests of the Debtor, its creditors and its estate. Significant savings in fees, costs and time will be achieved by this Settlement. The continued risk of litigation to all parties will be avoided. Substantial claims by and against the Debtor, MCP and others will be fully and finally resolved. Most importantly, this Settlement will provide the mechanism for an immediate Chapter 11 exit strategy that will be implemented through confirmation of the Second Amended Plan, pursuant to which all creditors will be paid in full with interest. Confirmation of the Second Amended Plan will also result in the continued, uninterrupted business operations of the Debtor under current management with the continued employment of all of the Debtor's employees being preserved.

**Objections of Wisconsin Cheese**

The Objection of Wisconsin Cheese to the Amended Plan contends that it unfairly distinguishes in favor of MCP and against Wisconsin Cheese contrary to 11 U.S.C. § 1122(a), and in violation of the equal treatment requirements of § 1123(a)(4) and therefore contrary to § 1129(a)(1). Its Objection to the Settlement contends that the Settlement is a de facto reorganization Plan that bypasses the Plan confirmation process, but its opposition lies essentially in the incorporation of the Settlement into the Plan.

MCP is an unsecured creditor and is the only creditor in Class 2 of the proposed Plan. All other unsecured creditors are placed in Class 3. Wisconsin Cheese with a claim of $40,000 is in Class 3 and is the only creditor in that or any class that voted against the Plan.

The Plan does not unfairly discriminate between Class 2 (MCP)[3] and Class 3 (general unsecured trade creditors) because the Plan does not shift the risk of non-payment from one class to another. True, MCP is granted a lien, and also a right of first refusal under the Plan should the Quay business be sold, while Class 3 creditors are not granted either lien or right of first refusal. However, those two accommodations were negotiated to facilitate collection of claims from the Debtor due to both Class 2 and Class 3 creditors and do not afford Class 2 superior substantive treatment over Class 3.

First, as to the lien rights, the Plan provides that failure to pay Class 2 or Class 3 creditors as and when due is a default with respect to both classes (i.e. a cross-default). See Plan at Sec. 8.14(a). A default by the Debtor on payments due to either Class 2 or Class 3 will trigger MCP's right to foreclose on the lien granted to MCP under the Plan. See Plan at Sec. 8.11(a). The Plan provides that upon such foreclosure, MCP will either pay Class 3 creditors remaining debt due in full, or both MCP and Class 3 will share the lien proceeds pro rata. See Plan at Sec. 8.11(b)(c) and (d). For practical purposes Class 3 is given a protection equal to having a lien upon the Debtor's assets of equal priority to that of MCP because the Class 2 creditor in effect would act as a fiduciary for Class 3 with duties to account for recoveries on the lien and to share those recoveries. Thus, neither Class 2 nor Class 3 has an advantage arising from the lien granted to MCP under the Plan, and there is no materially greater risk of non-payment foisted upon either class. The procedural method to enforce the

---

[3] As used herein, the term MCP shall specifically include all parties and affiliates of MCP which were allowed to be joined in this action pursuant to an Order entered by this Court on January 23, 2007.

lien protecting both classes is to designate the single creditor in Class 2 with authority to foreclose. The alternative procedure urged by Wisconsin Cheese counsel is to have all unsecured creditors own the lien in common and require all unsecured creditors to act jointly to enforce the lien, a clearly impractical and unworkable device.

Second, the right of first refusal granted to MCP if a Debtor ever sells the business (see Plan at Sec. 6.6) does not shift the risk of non-payment to Class 3. If the Debtor does decide to sell its assets, all insider debt and equity would be subordinated to Classes 2 and 3. See Plan at Sec. 7.1. Thus, it would be unlikely for the Debtor to sell its assets if insiders and equity would receive no distribution from such sale. Further, a sale for less than the debt owed to Classes 2 and 3 would continue the effectiveness of the Hector and Victor Guaranties (as defined in the Plan) See Plan at Sec. 6.5 and 6.8. If, for some reason, the Debtor decided to sell its assets for a price which did not satisfy Classes 2 and 3 in full, then Classes 2 and 3 still have complete recourse to pursue the Hector and Victor Guaranties. To the extent that the Debtor sells its assets for an amount insufficient to pay Class 3, but MCP is paid from the sale on its lien in whole or in part, then the claims against the Hector and Victor Guaranties by MCP would be reduced, leaving a larger corpus of the assets of those guarantors from which Class 3 would be paid. The independent Committee of Unsecured Creditors would survive Plan confirmation, and that Committee is given the standing and power to enforce those Guaranties for benefit of unsecured creditors.

It must be noted that when Wisconsin Cheese objects to the Plan provision giving right of first refusal to MCP it argues as an interested future potential buyer of the Debtor's business in a hypothetical future sale, not as a present creditor. It cites no authority for a

bankruptcy creditor in Chapter 11 to have standing to assert investment rights as an interested future buyer to object to proposed Plan terms, and its Objection to Plan must also be overruled on that ground.

**Argument**

Section § 1122 of the Bankruptcy Code provides:

Classification of claims or interests

(a)  Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class;

(b)  A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

This provision governs classification of claims in Chapter 11 of the Bankruptcy Code. While the express language of section 1122(a) refers only to classification of similar claims, it has been held in the First and Fifth Circuits that it is generally improper to classify claims of similarly situated creditors separately. See Granada Wines, Inc. v. New England Teamsters and Trucking Indus. Pension Fund, 748 F.2d 42, 46 (1st Cir. 1984) ("Separate classifications for unsecured creditors are only justified where the legal character of their claim is such as to accord them a status different from the other unsecured creditors." (internal citations omitted)). Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture), 995 F.2d 1274, 1278 (5th Cir. 1991) ("[O]rdinarily, 'substantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class."). In Third, Sixth, and Eighth Circuit opinions, a less rigid standard has been

applied. Cf Teamsters Nat'l. Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.), 800 F.2d 581, 584-86 (6th Cir. 1986) (finding that although §1122(a) does not explicitly bar separate classification of similar claims, the right is not without limit); In re Jersey City Medical Ctr, 817 F.2d 1055, 1060-61 (3d Cir. 1987) (same); Hanson v. First Bank of South Dakota, 828 F.2d 1310 (8th Cir. 1987).

Section 1322 of the Bankruptcy Code is a counterpart to Section 1122 in Chapter 11. See § 1322(b)(1); In re Crawford, 324 F.3d at 541. It forbids "unfair" discrimination between classes. Opinions construing classification under a plan proposed pursuant to Chapter 13, § 1322(b)(1) may be seen to provide guidance in cases under § 1122(a) of Chapter 11.

"Unfair discrimination [forbidden under § 1322] is not defined in the Bankruptcy Code, nor does the statute's legislative history provide guidance as to its interpretation. 'Generally speaking, this standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes.' The pertinent inquiry is not whether the plan discriminates, but whether the proposed discrimination is 'unfair'." In re Armstrong World Indus., 348 B.R. 111, 121 (D. Del. 2006) (internal citations omitted).

While § 1122 is analogous to § 1322(1), it does not prohibit "unfair" discrimination by its terms, though some authorities have seen the prohibition of unfairness as implied. Nor does § 1122 expressly forbid discriminatory treatment except by reading from permission in § 1122(a) to join similar clams in a class the inference that placing similar claims in different classes may be improper.

Courts have sought to identify a standard to evaluate whether a plan unfairly discriminates. See id. Some courts have used the following four part test:

    A.    whether the discrimination has a reasonable basis;

    B.    Whether the debtor can carry the plan out without discrimination;

    C.    Whether the discrimination is proposed in good faith; and

    D.    Whether the degree of discrimination os directly related to the basis or rationale for the discrimination.

Davis, 209 B.R. at 895; See also Crawford, 324 F.3d 539 at 542 (7th Cir. 2003). This test, known as the Lesser test, was established by the 8th Circuit and has been criticized of late as "amorphous," "abstract," "illogical," and "circular." Davis, 209 B.R. at 895; See also Crawford, 324 F.3d at 542.

At least three additional tests have been espoused by courts in attempting to define the parameters of unfair discrimination. See Crawford, 324 F.3d at 542. In Crawford, the Seventh Circuit panel specifically rejected any sort of formulaic approach to unfair discrimination. After espousing the shortcomings of four distinct tests of unfair discrimination, the opinions stated:

> We haven't been able to think of a good test ourselves. We conclude, at least provisionally, that this is one of those areas of the law in which it is not possible to do better than to instruct the first-line decision maker, the bankruptcy judge, to seek a result that is reasonable in light of the purposes of the relevant law, which in this case is Chapter 13 of the Bankruptcy Code; and to uphold his determination unless it unreasonable (an abuse of discretion).

Crawford, 324 F.3d at 542.

While no one test is determinative, in this case the most sensible approach lies in the "shifting of risk" test espoused by In re Armstrong World Indus., 348 B.R. at 121-22. In Armstrong World Indus., the Court applied what it termed the Markel test, named after Bruce A. Markel and his article, A New Perspective on Unfair Discrimination in Chapter 11, 72 Am. Bankr. L.J. 227 (1998). Under the Markel test, a rebuttable presumption of unfair discrimination arises when there is:

> (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.
>
> If there is an allegation of a materially lower percentage recovery, the presumption can be rebutted 'by showing that, outside of bankruptcy, the dissenting class would similarly receive less than the class receiving a greater recovery, or that the alleged preferred class had infused new value into the reorganization which offsets its gain.' A demonstration that the risk allocation was similar to the risk assumed by the parties prior to bankruptcy can rebut the presumption that a discriminatory risk allocation was unfair."

Armstrong World Indus., 348 B.R. at 121-22. (citations omitted).

That statement is a way of determining whether the Code requirement of equal treatment "for each claim or interest of a particular claim" has been substantially met. 11 U.S.C. § 1123(a)(6). The equal treatment requirement looks to the substance of equal treatment, not to procedural or even small temporal differences between class treatment. Enron Corp. v. New Power Co., 438 F.3d 1113, 1122-23 (11th Cir. 2006).

In the case at bar, the Amended Plan does not unfairly discriminate because it does not at all shift risk from one class to another. Wisconsin Cheese argues that the lien and right of first refusal granted to MCP under the Plan somehow place MCP in a better position than Class 3 creditors, but that argument is misplaced.

The lien granted to MCP benefits all creditors, not just MCP. As stated above, the Plan provides cross-default provisions regarding payments to Classes 2 and 3. See Plan at 8.14(a). In the event of a default to either class, MCP becomes entitled to enforce its lien. See Plan at Sec. 8.11(a). MCP has agreed that upon enforcement of its lien and foreclosure upon the collateral, MCP will either pay Class 3 creditors in full, or share the proceeds of same pro rata with Class 3 creditors. See Plan at Sec. 8.11(b)(c) and (d). As earlier noted, MCP will serve as fiduciary for benefit of all unsecured creditors should it enforce the lien. Thus, the contention by Wisconsin Cheese that the lien granted to MCP harms Class 3 in the event of a default is not correct.

In event of a sale of the Debtor's assets, neither the lien nor the right of first refusal granted to MCP shifts a risk of non-payment to Class 3. Should Debtor decide to sell its assets, all insider debt and equity is subordinated to Classes 2 and 3. See Plan at 7.1. Thus, it would be unlikely for the Debtor to sell its assets if insiders and equity would not receive a distribution from such sale. If for some reason the Debtor did sell its assets for a price which did not satisfy Classes 2 and 3 in full, Class 3 creditors still have complete recourse to pursue the Hector and Victor Guaranties. See Plan at Sec. 6.5. and 6.8. The extent that MCP is paid (in whole or in part) as a result of its lien from a sale (not a foreclosure, as discussed above),

then the claims of MCP against the guarantors would decrease, leaving a larger corpus of the guarantors' assets from which Class 3 would be paid.

The argument put forth by Wisconsin Cheese that the right of first refusal (See Plan at Sec. 6.6) somehow reduces the likelihood that Class 3 will be paid is also wrong. If the Debtor were to invite offers to purchase its assets, there would be several possible outcomes: First, a third-party purchaser such as Wisconsin Cheese could make an offer and MCP could either exercise its right of first refusal or not. Should the bidding end there, the amount of purchase price dollars would be the same, only the purchases would be different, which should be irrelevant to Class 3. But more likely, a "bidding war" could ensue between a third-party purchaser and MCP, which is obviously better for all parties. And third, if no third-party purchaser made an offer, the reorganized Debtor would not be obligated to accept any offered sale price and could negotiate with MCP for a fair market value price. In this situation, it is likely that the Debtor would only sell its assets at a price which would eliminate the guaranties of its insiders. In the event Class 3 is not paid in full from a sale of the Debtor's assets, Class 3 (through the Creditors Committee) retains a right to pursue the Hector and Victor Guaranties. If, for some reason, MCP is paid a greater percentage of its debt than Class 3 is paid on its debt as a result of a sale of the Debtor's assets, that simply leaves more assets of the guarantors available for distribution to Class 3. Increasing the pool of assets from which Class 3 could collect cannot be said to shift a greater risk upon Class 3.

Wisconsin Cheese appears to be expecting a sale of the Debtor in the event the Debtor cannot comply with its payment obligations. See Objection of Wisconsin Cheese at Page 6. Under this circumstance, however, the Debtor would be in default, triggering MCP's right to

foreclose and its attendant obligations to share foreclosure proceeds with Class 3. If there were a default to Class 3, MCP would likely pursue foreclosure rights for the benefit of both classes.

## CONCLUSION

Improper classification under § 1122 could be seen if similar unsecured creditors in different classes face materially different risk of payment or different percentages of dividend. The facts and circumstances of this case, however, show that Class 2 and Class 3 are treated equally in the protection and collection of their claims. The lien rights given to the Class 2 creditor as a fiduciary facilitate payment to both classes, and the right of first refusal does not at all threaten or diminish recovery by Class 3 creditors.

Accordingly, the Objection of Wisconsin Cheese to the proposed Plan and its Objection to Settlement, will each be overruled. Those Objections sought to block consideration of the Plan and hearing thereon. The Plan proponents must, of course, still establish all statutory requirements for Plan confirmation.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated and entered this 17th day of July 2007.